**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ALEJANDRO NAVA and SHANTNU MALHOTRA, on behalf of themselves, all others similarly situated, and the general public,<br><br>    Plaintiffs,<br><br>        v.<br><br>KOBE STEEL, LTD., KOBE STEEL USA INC., KOBE STEEL INTERNATIONAL (USA) INC., KOBE ALUMINUM AUTOMOTIVE PRODUCTS, LLC, SHINSHO CORPORATION, SHINSHO AMERICAN CORPORATION, TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., and TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.<br><br>    Defendants. | Case No.: 18-cv-1423<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR BREACH OF WARRANTY AND CONSUMER FRAUD**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs ALEJANDRO NAVA and SHANTNU MALHOTRA, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby bring this action against defendants KOBE STEEL, LTD. ("Kobe" or "Kobe Steel"), KOBE STEEL USA INC. ("Kobe Steel US"), KOBE STEEL INTERNATIONAL (USA) INC. ("Kobe International US"), KOBE STEEL USA HOLDINGS INC. ("Kobe Holdings US"), KOBE ALUMINUM AUTOMOTIVE PRODUCTS, LLC ("Kobe Aluminum"), SHINSHO CORPORATION ("Shinsho"), SHINSHO AMERICAN CORPORATION ("Shinsho American"), TOYOTA MOTOR CORPORATION ("Toyota"), TOYOTA MOTOR SALES, U.S.A., INC. ("Toyota US"), TOYOTA ENGINEERING & MANUFACTURING NORTH AMERICA, INC. ("Toyota Engineering"), and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## INTRODUCTION

1.     In October 2017, Japanese steel manufacturer Kobe Steel, Ltd. revealed that, for more than a decade, it falsified data and failed to perform mandatory quality checks relating to many of its steel, aluminum, and copper products, which were certified and sold as having critical properties, such as levels of tensile strength or amounts of thickness, that they did not have (the "Substandard Metals").

2.     Kobe's Substandard Metals have been sold to hundreds of companies for use in a wide variety of products including bullet trains, commercial and personal aircraft, automobiles, electronics, and products for the nuclear-power industry. These products are typically manufactured to exacting specifications and tolerances, for which any deviations can have serious safety or performance consequences.

3.     Relevant here, the Substandard Metals are used in at least certain Prius, Camry, Land Cruiser, and Lexus automobiles sold or leased to United States consumers by automotive giant Toyota.

4.     Plaintiffs are owners and lesees of Toyota automobiles containing Substandard Metals. They brings this action on behalf of themselves and all others similarly situated who purchased or leased in the United States Toyota or Lexis automobile models containing Substandard Metals (the "Defective Vehicles"). Plaintiffs bring claims under federal and state law, seeking monetary and injunctive relief.

# THE PARTIES

## I.  PLAINTIFF

5.     Plaintiff Alejandro Nava is a resident of Oakland, California. Mr. Nava leases a 2015 Toyota Prius that was manufactured in Toyota's Tsutsumi Plant in Aichi, Japan.

6.     Plaintiff Shantnu Malhotra is a resident of Sunnyvale, California. Mr. Malhotra owns a 2016 Toyota Prius *c* that was manufactured in Toyota's Kanto Auto Works Plant in Iwate, Japan.

## II.  THE KOBELCO DEFENDANTS

### A.  The Japanese Entities

7.     Defendant KOBE STEEL, LTD. ("Kobe" or "Kobe Steel") is a Japanese stock company with its principal place of business in Kobe, Japan. Kobe was founded in 1905, incorporated in 1911, and is Japan's third-largest steel manufacturer, as well as a major supplier of aluminum and copper products. Kobe has 213 subsidiaries and 56 affiliated companies, both domestically and abroad, making up what is known as the Kobe Steel Group. "KOBELCO" is the corporate logo mark and brand name of the Kobe Steel Group. Kobe's website states that, "Behind the KOBELCO mark is Kobe Steel's commitment to excellence and quality."[1]

8.     Defendant SHINSHO CORPORATION ("Shinsho") is a Japan stock company with its principal places of business in Osaka and Tokyo, Japan. Shinsho is Kobe's largest single customer, comprising more than 13% of its revenue, and its "core trading partner." Shinsho imports and exports products such as iron and steel, ferrous raw materials, nonferrous metals, machinery, and welding.

### B.  The American Entities

9.     Defendant KOBE STEEL USA INC. ("Kobe Steel US") is a Delaware corporation with its principal place of business at 19575 Victor Parkway, Suite 200, Livonia, Michigan 48152.

10.     Defendant KOBE STEEL INTERNATIONAL (USA) INC. ("Kobe International US") is a Delaware corporation with its principal place of business at 19575 Victor Parkway, Suite 200, Livonia, Michigan 48152.

11.     Defendant KOBE ALUMINUM AUTOMOTIVE PRODUCTS, LLC ("Kobe Aluminum") is a Kentucky limited liability company with its principal place of business at One Kobe Way, Bowling Green,

---

[1] http://www.kobelco.co.jp/english/about_kobelco/kobesteel/profile/index.html

Kentucky 42101. Kobe Aluminum manufactures and sells aluminum forgings for automotive suspensions.

12.     Defendant SHINSHO AMERICAN CORPORATION ("Shinsho American") is a Delaware corporation with its principal place of business at 26200 Town Center Drive, Suite 160, Novi, Michigan 48375. Shinsho American is a wholly-owned subsidiary of Shinsho. Shinsho American provides aluminum fabricated parts for suspension frames, surrounding engines, beds of trucks and other parts for vehicles.

*                *                *

13.     Defendants Kobe Steel, Kobe Steel US, and Kobe International US, are collectively referred to herein as the "Kobe Defendants," or "Kobe."

14.     Defendants Shinsho and Shinsho American are collectively referred to herein as the "Shinsho Defendants," or "Shinsho."

15.     The Kobe Defendants, together with the Shinsho Defendants, are collectively referred to herein as the "Kobelco Defendants."

## III.     THE AUTOMAKER DEFENDANTS

16.     Defendant TOYOTA MOTOR CORPORATION ("Toyota") is a Japanese stock company with its principal place of business in Toyota City, Aichi Prefecture, Japan. Toyota the world's largest automobile manufacturer, and the largest seller of automobiles in the United States. The Toyota Motor Corporation encompasses Lexus as its luxury vehicle division.

17.     Defendant TOYOTA MOTOR SALES, U.S.A., INC. ("Toyota US") is a California company with its principal places of business during the class period at 19001 S. Western Ave., Torrance, California 90501, and 6565 Headquarters Drive W1-3C, Plano, Texas 75024. Toyota US is a wholly-owned subsidiary of Toyota. Toyota US is responsible for the marketing, sales, and distribution in the United States of automobiles manufactured by Toyota.

18.     Defendant TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC. ("Toyota Engineering") is a Kentucky company with its principal places of business during the class period in Erlanger, Kentucky, and 6565 Headquarters Drive W1-3C, Plano, Texas 75024, and with major operations in Arizona, California, and Michigan. Toyota Engineering is a wholly-owned subsidiary of Toyota and is responsible for Toyota's engineering design and development, research and development, and manufacturing activities in the United States.

*    *    *

19. Defendants Toyota, Toyota US, and Toyota Engineering are collectively referred to herein as the "Toyota Defendants" or "Toyota."

## JURISDICTION AND VENUE

20. The Court has federal question jurisdiction under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*., and supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367. The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, at least one member of the class of plaintiffs is a citizen of a State different from at least one Defendant.

21. The Court has personal jurisdiction over defendants pursuant to Cal. Code Civ. P. § 410.10, as a result of their substantial, continuous and systematic contacts with the State, and because they have purposely availed themselves of the benefits and privileges of conducting business activities within the State.

22. Venue is proper in this Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because defendants are subject to personal jurisdiction in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## INTRADISTRICT ASSIGNMENT

23. Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) & 3-5(b), this action is properly assigned to the San Francisco or Oakland Division because the action arises in Alameda County in that a substantial part of the events or omissions which give rise to plaintiff's claims occurred in Alameda County.

## FACTS

## I. KOBE MANUFACTURES METAL & METAL PARTS FOR THE AUTOMOTIVE INDUSTRY

24. Automobiles have at least several thousands of parts, which automobile manufacturers typically acquire from hundreds of different suppliers.

25. Kobe is a supplier of metals and metal parts to Toyota, including through its subsidiary, Kobe Steel US, and trading partner Shinsho (including Shinsho's U.S. subsidiary, Shinsho America).

26. For example, Kobe manufactures purported high-tensile-strength steel sheet metal, for use in

4

automobile skeletons and body panels. As Kobe explains in marketing materials:

> As the importance of protecting the global environment is increasing all over the world, automobile manufacturers are working on lightening the weight of the body to achieve $CO_2$ emission reduction (improvement in fuel efficiency). In recent years, fuel efficiency regulations have been strengthened all over the world, and the flow of weight reduction is in a state of no waiting. In particular, so-called "environmentally compatible vehicles" such as hybrid cars, electric cars, fuel cell cars, etc., sometimes have heavy batteries, and further weight reduction is required for the car body.

In the same marketing materials, Kobe recognizes that, in manufacturing high-tensile steel to reduce automobile body weight, "it is not permissible to sacrifice collision safety, that is, rigidity of the car body."

27.    Kobe also manufactures high-tensile steel wire rods and bars for use in automobile parts like springs and bolts, including such crucial parts as engine valve springs and suspension springs. The following graphic provides examples of the use of Kobe-manufactured steel in an automobile.



28.    Kobe also manufactures steel for the bearings in automobile parts that make use of ball bearings, like the parts pictured below.



29.     Kobe also manufactures aluminum products for automobiles, including forged suspension parts, suspension frames, extruded and processed bumper parts, truck beds, and panels for hoods and trunk lids, among others. The following graphic provides examples of the use of Kobe-manufactured aluminum in an automobile.



6

30.     Kobe also manufactures steel wire for use as a skeleton in tires, as pictured below.



31.     Kobe also manufactures certain parts, such as copper products and specialized steel, for use in LCD screens in automobiles.

32.     When supplying metals and metal parts directly to automobile manufacturers like Toyota, the manufacturers typically require that the metal meet certain quality standards, including things like minimum tensile strength, thickness, and durability ratings. These standards are intended to ensure the safety of consumers who use vehicles containing such metals and metal parts, the optimum performance of the vehicle, and the durability of those products. These standards are set out in contracts and other written documentation between the manufacturers and Kobe, or members of the Kobe Steel Group. Moreover, automakers require that Kobe certify that its metals have met the applicable standards upon delivery, and that Kobe provide a written inspection certification.

33.     In addition to supplying metals and metal parts directly to automobile manufacturers, Kobe sells metal and metal parts to automobile part makers, who then sell parts to automobile manufacturers. Automobile manufacturers receive components for assembling vehicles from suppliers across three tiers, Tier One (T1), Tier Two (T2), and Tier Three (3). Manufacturers generally do not have knowledge of the suppliers of the materials used to make T1, T2, and T3 components, nor access to quality control or assurance information relating to components received from T1, T2, and T3 suppliers. Accordingly, automobile manufacturers like Toyota may have purchased parts containing Substandard Metal through a T1, T2, or T3 supplier, without knowing (or being able to trace) the metal to Kobe, or knowing that the part contains Substandard Metal.

34.     Demand for components used by automobile manufacturers is inelastic because an increase in the price of a product typically results in only a small decline in the quantity sold, since customers have nowhere to turn for alternative products of similar quality. Demand for automotive metals like those Kobe produces is highly inelastic because there are no close substitutes for these products. Moreover, the ultimate purchaser of a vehicle must purchase components made from metal as an essential part of the vehicle. Because of the intensely competitive nature of the automobile industry, the costs of inputs, including automotive metal, is passed on by manufacturers to ultimate purchasers of the vehicles, like plaintiff and other class members. Today, approximately 7% of the cost of a new vehicle is related to aluminum.

## II.     KOBE FALSIFIED DATA RELATING TO ITS METALS' COMPLIANCE WITH MANDATORY STANDARDS AND CUSTOMER SPECIFICATIONS

35.     Kobe's business is comprised of various divisions, among them its Iron & Steel Business and its Aluminum & Copper Business.

36.     In June 2016, a company in Kobe's Iron & Steel Business, Shinko Wire Stainless Co., Ltd., was found to be in violation of the Japan Industrial Standardization ("JIS") Act. This led the Kobe Steel Group to undertake a Group-wide inspection with respect to mandatory JIS standards. In addition, companies in Kobe's Iron & Steel Business audited actual goods by comparing the data on test reports provided to customers with raw test data.

37.     In November 2016, Kobe Steel Group established a Quality Management Section in Kobe's head office's Product Manufacturing Planning and Promotion Department to strengthen quality control systems.

38.     In April 2017, Kobe launched a quality audit of the manufacturing facilities and service locations throughout the entire Kobe Steel Group, which examined compliance with both mandatory standards set forth in applicable laws and regulations, and customer-provided specifications.

39.     In early August 2017, Kobe further required that, starting in September 2017, the entire Group conduct self-inspection of records for products shipped to customers between September 2016 and August 2017.

40.     In late August 2017, Kobe's Aluminum & Copper Business reported that it had started its self-inspection ahead of schedule, and had detected improper handling of test data. In response, the

Aluminum & Copper Business ceased shipping nonconforming products and began trying to recover work-in-process and inventory to minimize the number of nonconforming products that would reach the market. In the meanwhile, staff at Kobe's head office, and outside counsel investigated the improper conduct, reporting the results of their investigation to Kobe's Management Council on September 12, 2017.

41.     Kobe subsequently created four task forces (TF): the Emergency Audit TF, the Customer Support TF, the Cause Investigation TF, and the Public Announcement TF.

42.     Kobe began contacting its affected customers in early September 2017. Technical staff from Kobe's sales, quality assurance, and manufacturing visited customers' offices to explain the details of the nonconformities, report serial numbers of non-conforming products, and give explanations as to actual test data for delivered products or estimated test data, and the grounds for such estimates.

43.     On October 8, 2017, Kobe announced that it had "discovered that in its Aluminum & Copper Business . . . a portion of the products traded with customers did not comply with the product specifications which were agreed between the Company and its customers." This was because "Data in inspection certificates had been improperly rewritten . . . and the products were shipped as having met the specification concerned . . . ."

44.     At the time of its initial revelation, Kobe announced that the "main" "nonconforming products" affected by this "improper conduct" were "Aluminum flat-rolled products, aluminum extrusions, copper strips, copper tubes, and aluminum castings and forgings that were shipped between September 1, 2016 and August 31, 2017." Specifically, Kobe announced that the data falsification had affected approximately 19,300 tons of flat-rolled and extruded aluminum products, 2,200 tons of copper products, and 19,400 units of aluminum castings and forgings.

45.     Kobe also stated that, "For the customers to which these nonconforming products were shipped, the Company has begun contacting them one by one and explaining the situation," and that it "has been carrying out technical verifications with its customers on the impact of the nonconforming products on quality (including safety) of the end products."

46.     Kobe also stated that it was conducting a further investigation "as to whether or not similar improper conduct exists in other business units." Kobe later reported that "to ensure fairness in the investigation and neutrality," it had "commissioned an outside law firm to conduct an investigation to gain

9

the full picture on the facts concerning improper conduct . . . ."

47.     Kobe promised that "In the event that doubts arise on the safety of the nonconforming products, the Company will quickly take appropriate action."

48.     "In view of the seriousness of the situation," Kobe also announced it had "established [an] investigation committee on quality issues," and that it would "conduct a thorough analysis of the causes and take companywide measures to prevent recurrence," including "strengthen[ing] Group governance on quality by reorganizing the quality assurance organization," "review[ing] the inspection system and capital investments to improve quality," and "driv[ing] reforms to change the mindset of quality compliance, including in Group company employees, by rebuilding its education system and taking other steps."

49.     Finally, Kobe stated that "Causing this serious matter has brought overwhelming shame to the Company," and that it "deeply regrets this incident and sincerely apologizes for the enormous worry and trouble this incident has caused to its customers and other related parties."

50.     On October 11, 2017, Kobe announced that its continuing investigation had revealed "a similar kind of improper conduct" with respect to:

    a.     140 tons of "Steel powder for powder metallurgy (sintering)" shipped in Fiscal Year 2016 to 1 customer; Kobe revealed that there had been "Improper rewriting of inspection data of a product outside the compact density agreed with the customer."

    b.     6,611 units of sputtering target materials[2] shipped to 70 customers beginning in November 2011; Kobe revealed "Improper conduct" including "Not conducting tests agreed with customers," and "improper rewriting of inspection data with regard to products outside the component values agreed with customers."

51.     On October 13, 2017, Kobe announced that its continuing investigation had revealed "similar cases of improper conduct . . . in the Kobe Steel Group companies," with respect to:

    a.     Approximately 700 tons of copper alloy tubes shipped to 42 customers, and 5,300 units of copper molds shipped to 137 customers between September 2016 and August 2017; Kobe revealed that "inspections (dimensions, etc.), which Kobe Steel had agreed with customers, was not conducted," and there had been "Rewriting of inspection data prescribed in the specification sheets,

---

[2] This is a process for depositing thin films of material on parts.

despite having agreed to previously prescribed specifications with customers."

b.  Approximately 750 tons of copper capillary tubes shipped to 28 customers between September 2016 and August 2017; Kobe revealed that "inspections (dimensions, etc.) and tests (mechanical properties, etc.), which Kobe Steel had agreed with customers to carry out, were not conducted."

c.  Approximately 1,140 tons of copper tubes shipped to 5 customers between September 2016 and August 2017; Kobe revealed that "Tensile testing, which Kobe Steel had agreed with customers to carry out, was not conducted, and instead a hardness test was substituted," and "an estimated calculation was entered as tensile strength based on the results of the hardness test."

d.  12.5 tons of aluminum alloy wires and bars, shipped to 2 customers between September 2016 and August 2017; Kobe revealed that "inspection items, which Kobe Steel had agreed with customers to carry out, was not conducted, and inspection data was rewritten." Moreover, "Unmeasured microalloyed chemical values were entered, and a portion of the tensile properties, which were target values for reference, was used."

e.  31 tons of copper strips shipped to 2 customers between September 2016 and August 2017; Kobe revealed there had been "Rewriting of inspection data of specifications (dimensions, etc.), despite having agreed to previously prescribed specifications with customers."

f.  3,525 tons of steel wires shipped to 1 customer between July 2011 and July 2017 and 306 tons of steel wires shipped to 1 customer between December 2015 and April 2016; Kobe revealed that "A portion of the inspection, which Kobe Steel had agreed with the customer to carry out, was not conducted."

g.  533 tons of stainless steel wire shipped to 1 customer between April 2007 and May 2016; Kobe revealed "Rewriting the results of tests in the specification sheets, despite having agreed to previously prescribed specifications with customers."

52.  On October 20, 2017, Kobe announced that it had "contacted nearly all customers with regard to the improper conduct in the Aluminum & Copper Business and other affected business units announced to date." Kobe stated that it "has been making full efforts to confirm whether the nonconforming products used in customers' products have affected the quality (including safety) of their products," and "aims to

report the result of those efforts by the end of this month."

53.     Kobe further stated that, "To date, a number of our customers in car and vehicle manufacturing businesses have found no problems with the safety of Kobe Steel's products. Kobe Steel expresses its deep appreciation for those customers' work in an effort to assure safety to consumers and other customers."

54.     On October 20, 2017, Kobe also announced that the Japan Quality Assurance Organization (JQA), a body that certifies materials under a "JIS Standard," had been investigating the improper conduct reported on October 8 by one of Kobe's subsidiaries, Kobelco & Materials Copper Tube Co., Ltd. ("KMCT"). Kobe reported that "products displaying the JIS mark have been undergoing examination . . . by JQA," and while "JQA examination procedures are not yet completed," Kobe "has received indication of problems in quality management at KMCT's Hatano Plant." As a result, KMCT "refrained voluntarily from displaying the JIS mark [on] further shipments." Kobe explained that, "With regard to the concerned products, data on the inspection certificates had been rewritten to meet JIS standards for tensile strength as well as on the grain size." Kobe reported that this "improper conduct concerning products with JIS marks" pertained to 25 tons of copper and copper alloy seamless tubes shipped to 4 customers between September 2016 and August 2017.

55.     On October 20, 2017, Kobe also reported improper conduct relating to 3,793 tons of heavy plate processed products shipped to 1 customer between November 2015 and September 2017, revealing that "measurements for plate thickness requested by the customer was not conducted," and "Plate thickness measurement data was rewritten to match the customer specifications."

56.     That same day, October 20, Kobe revealed that, through its investigation, it "discovered . . . that there was non-compliance with reporting directives by some Kobe Steel Group employees, including a number of managers." Specifically, with respect to certain aluminum extrusions, "some Kobe Steel Group employees, including managers, did not report on the quality inspection data of nonconforming products whose dimensions were outside the standards specified by customers. . . . In addition, when an emergency audit was conducted by the head office, the proper quality inspection data was not reported . . . ." Kobe also noted it "has not verified whether similar incidents have occurred . . . ."

57.     On October 26, 2017, Kobe announced it was investigating four additional cases of "possible

12

improper misconduct," but otherwise stated, "we have largely completed the self-investigations" that Kobe had initiated in September 2017.

58.     Kobe then "report[ed] on the verification status of safety and the establishment of an independent investigation committee." Specifically, Kobe stated that it had taken the following "initiatives for customers' safety verification":

a.     "For all customers to whom Kobe Steel has supplied nonconforming products, Kobe Steel has contacted customers [and advised them] of this noncompliance."

b.     "Kobe Steel has explained to customers the discovered extent of deviations from the specifications with specific data, including target details, nonconforming inspection items, original inspection data in the case of falsification, and other details. Kobe Steel has asked customers to confirm the impact on the customers' products and safety."

c.     "To confirm safety, Kobe Steel has supplied data, provided its technical opinion on the impact of its nonconforming products on customers' products, undertaken explanations to parties beyond customers upon request and taken other steps, making its utmost effort to confirm safety."

59.     Kobe reported that "at present," "For customers to whom nonconforming products . . . over the past one year, were shipped and for products other than those delivered directly to customers, the use of these products have been stopped. In addition, at this time Kobe Steel has not confirmed cases which would require immediate product recall."

60.     Kobe noted, however, that "for the confirmation of safety and to carefully check the impact on customers that are ultimate customers, safety verification is currently proceeding. As the supply chain is wide, there are cases where time is required to pursue the supply chain of nonconforming products supplied by Kobe Steel. To confirm product safety, the verification of the safety of all products has not yet been completed."

61.     Kobe further stated that it had classified the "safety verification status" of the 525 companies to which it had shipped the Falsified Metals into "A: Customers [that] have completed safety verification," "B: Customers [that] have concluded that no problems exist at this time, but continue further verification," and "C: Kobe Steel has concluded that safety can be assumed with a high degree of certainty from its technical opinion and has informed customers to this effect." Kobe set forth the relevant data as follows.

| Improper part | Company name | Material | Main use | No. of customers | A | B | C | Total (A-C) |
|---|---|---|---|---|---|---|---|---|
| Aluminum & Copper | Kobe Steel, Ltd. Aluminum & Copper Business (Oct. 8, 2017) | Aluminum sheets | Can stock Cars | 57 | 28 | 6 | 0 | 34 |
| | | Aluminum cast & forged parts | Aircraft Rolling stock | 67 | 0 | 66 | 0 | 66 |
| | | Aluminum extrusions | Cars Rolling stock | 34 | 14 | 0 | 0 | 14 |
| | | Copper sheets | Semiconductors Terminals | 38 | 3 | 0 | 0 | 3 |
| | Kobelco & Materials Copper Tube Co., Ltd. (Oct. 8, 2017) | Copper tubes | Air conditioning | 23 | 12 | 7 | 0 | 19 |
| | Shinko Metal Products Co., Ltd. (Oct. 13, 2017) | Copper alloy tubes, Molds | Electrical machinery Steelmaking equipment | 176 | 61 | 7 | 103 | 171 |
| | Domestic subsidiary: 1 Overseas subsidiaries: 3 (Oct. 13, 2017) | Copper tubes Copper strips Aluminum wires | Air conditioning Terminals | 36 | 19 | 3 | 14 | 36 |
| Other | Kobelco Research Institute, Inc. (Oct. 11, 2017) | Target materials | FPD optical disks | 70 | 70 | 0 | 0 | 70 |
| | Steel Powder Division, Iron & Steel Business, Kobe Steel, Ltd. (Oct. 11, 2017) | Steel powder | Sintered parts | 1 | 0 | 1 | 0 | 1 |
| | Domestic subsidiaries, etc.: 2 Overseas subsidiaries, etc.: 2 (Oct. 13, 2017) | Steel wire Stainless steel wire | Bearings, springs | 22 | 22 | 0 | 0 | 22 |
| | Shinko Kohan Kako, Ltd. (Oct. 20, 2017) | Heavy plate processing | Heavy plate processed products | 1 | 0 | 1 | 0 | 1 |
| Total | | | | 525 | 229 | 91 | 117 | 437 |

62.     As shown in the table above, as of October 26, 2017, 229 of Kobe's 525 customers shipped Substandard Metals (43.6%) had purportedly completed safety verifications regarding the Substandard Metals.

63.     Kobe has periodically updated the table since. As of the most recent update on February 1,

14

2018, 377 customers (71.8%) had purportedly completed safety verifications regarding the Substandard Metals.

64.     During Kobe's self-inspection process, it encountered non-compliance with reporting directives, and other interference, including at a Chofu Works extrusion plant. On October 20, 2017, Kobe determined that a review and evaluation of the adequacy and validity of the self-inspections should be done by an organization comprised primarily of independent experts. On October 26, 2017, Kobe announced that it was establishing an Independent Investigation Committee "consisting only of outside members. The members of the independent investigation committee have had no involvement with the investigation to date, and by selecting lawyers that have no interests with Kobe Steel, objectivity and independence of the investigation are maintained."

65.     The purpose of the Independent Investigation Committee, according to Kobe, was to "Re-verify the appropriateness and suitability of the self-investigation and emergency audit in the investigation of the facts and discovery the causes of the chain of improper conduct," to "Investigate the cause on the background of corporate culture, compliance and the organizational management system, in addition to the direct cause of the improper conduct, as well as prevent recurrence, and proposed improvement plans," and to "Investigate items that the independent investigation committee deems necessary."

66.     Kobe stated that the Independent Investigation Committee was "aim[ing] to complete the investigation by the end of this year," *i.e.*, 2017, and "After the completion of the investigation . . . [would] make a report in an appropriate form to Kobe Steel's board of directors."

## III.     REACTION TO KOBE'S REVELATIONS OF DATA FALSIFICATION

67.     On around October 16, 2017, the U.S. Department of Justice served Kobe Steel US with a subpoena requesting the production of documents related to non-conforming Kobe products sold in the United States by Kobe, Kobe Steel US, or their subsidiary or affiliated companies. Kobe promised to "sincerely cooperate with the investigation."

68.     On October 17, 2017, U.S. Senator Richard Blumenthal (D-CT), a member of the Senate Judiciary and the Commerce, Science, and Transportation Committees, wrote to the U.S. Departments of Justice (DOJ) and Transportation (DOT), urging both to immediately begin investigating Kobe "in the wake of [its] shocking revelations of deceptive practices including data falsification." Senator Blumenthal

specifically called upon the DOJ to "secure restitution for American companies and consumers affected, and for DOT to coordinate safety recalls as needed."

69.     Senator Blumenthal noted, "It is estimated that Kobe Steel provided substandard aluminum, copper, and steel to about 500 companies—including six automakers that have substantial sales and manufacturing footprints in the U.S.—leaving consumers unaware and unsuspecting of potential serious, life-threatening equipment defects."

70.     Senator Blumenthal further urged the DOT, "In light of the massive potential impact of Kobe Steel's fabrication on consumer and passenger safety," to "launch an investigation so that your Department can evaluate whether Kobe Steel's concealment has compromised our transportation systems," given that "DOT has a duty to protect all passengers—whether traveling by car, air, or rail—from the safety consequences of such intentional and fraudulent deception." Finally, Senator Blumenthal urged the DOT to "immediately coordinate recalls for any safety defects you uncover."

71.     On October 26, 2017, JAQ cancelled KMCT's JIS certification relating to copper and copper alloy seamless tubes. Products bearing the JIS mark had comprised approximately 40% of KMCT's sales. Following these revelations, the European Aviation Safety Agency (EASA) advised its affiliates, "If there is an alternative supplier," they "must temporarily stop using Kobe Steel's products until it is confirmed that they meet the criteria."

72.     In October 2017, the Central Japan Railway Company, after testing its bullet trains, announced that 310 components were discovered to contain sub-standard parts supplied by Kobe.

73.     On November 15, 2017, notwithstanding the JIS cancellation, Kobe issued a press release stating, "Due to the suspension of the JIS certifications, KMCT is unable to ship the concerned products displayed with the JIS mark. However, it can supply products that are equivalent to the JIS standards in terms of performance."

74.     On December 5, 2017, Kobe announced that its Aluminum Extrusion & Fabrication Plant at Chofu Works underwent inspection by JIS certification bodies and subsequently received a suspension notice of its JIS certifications for that facility, covering aluminum and aluminum alloy bars and wires, extruded tubes and cold-drawn tubes, and extruded profiles. Kobe stated, "Due to the suspension of the JIS certifications, the Aluminum Extrusion & Fabrication Plant at Chofu Works is unable to ship the concerned

products displayed with the JIS mark. However, the plant can supply products that are equivalent to JIS in terms of performance."

75.     On December 8, 2017, Kobe announced that its Moka Plant underwent inspection by JIS certification bodies and subsequently received a suspension notice of its JIS certifications for that facility, covering aluminum and aluminum alloy sheets, strips, and plates. In addition, problems were found in the quality management system at subsidiary Shinko Metal Products Co., Ltd. As a result, Shinko Metal Products received a cancellation notice of its JIS certification. Kobe stated, "Due to the suspension of the JIS certifications, the Moka Plant and Shinko Metal Products are unable to ship the concerned products displayed with the JIS mark. However, the plant can supply products that are equivalent to JIS in terms of performance."

## IV.     SUBSTANDARD KOBE METAL IS IN TOYOTA AND LEXUS AUTOMOBILES

76.     Toyota is a shareholder of Kobe's Aluminum division, with the Toyota Tsusho Corporation owning 15% of Kobe Aluminum Automotive Products, LLC.

77.     Toyota sources aluminum plates, copper tubes, steel wires, and other metal products directly from Kobe Steel. Toyota also sources metal automobile parts from T1, T2, and T3 suppliers including steel powder, copper tubes, and other materials manufactured by Kobe, or with metals manufactured by Kobe.

78.     In 2014, Kobe and Toyota entered into a joint venture to produce aluminum sheets for use in future Camry hoods.

79.     Toyota has announced that Substandard Metals have been found in hoods, doors, and peripheral areas of automobiles manufactured in its Japanese plants. A spokesperson stated that Toyota "recognize[s] that this breach of compliance principles . . . is a grave issue."

80.     On October 19, 2017, Toyota stated that, "In response to the series of announcements by Kobe Steel Ltd. regarding improper conduct related to materials used in vehicle bodies, we have been urgently investigating the impact of this matter on Toyota and Lexus vehicles. The initial phase of our investigation has been focused on the aluminum plates that were the subject of Kobe Steel's initial disclosure, on October 8, 2017, of the falsification of data related to inspection certificates."

81.     Toyota further stated its belief "that the identified aluminum plates purchased both directly from Kobe Steel and via other suppliers were used in certain vehicles, primarily in the construction of hoods (bonnets), rear hatches and other components of our vehicles."

82.     Toyota further stated that it had "examined the data for the most recent three years possessed and provided by Kobe Steel and verified strength and durability of the affected aluminum plates, using the data Kobe provided that was furthest outside of Toyota's specifications. Based on that analysis, we confirmed that the materials satisfy applicable statutory standards, and our own internal standard, for key safety and durability requirements for vehicles."

83.     "However," Toyota stated, "since the announcement by Kobe Steel covers a wide range of products, we do not regard this matter as closed, and we are continuing our efforts to identify its full impact. We are currently working to identify the impact of affected non-aluminum materials on our vehicles."

84.     Toyota promised, "The safety and peace of mind of our customers are among our highest priorities, and we will continue to verify the safety of these materials based on our most stringent standards."

85.     Toyota's press release contained a table showing "Materials potentially affected by data falsification and its impact on Toyota and Lexus vehicles," which is replicated below.

| Method of delivery to Toyota | Date of announcement by Kobe Steel | Material | Impact on vehicles |
|---|---|---|---|
| Directly purchased | October 8 | Aluminum plates | **No impact** |
| | October 13 | Copper tubes, steel wires, etc. | Impact currently being confirmed |
| Purchased via supplier | October 8 | Aluminum plates | **No impact** |
| | | Cladding | Impact currently being confirmed |
| | | Aluminum extrusions | |
| | | Copper products | |
| | October 11 | Steel powder | |
| | | Sputtering target materials | |
| | October 13 | Copper tubes, steel wires, etc. | |

86.     On November 6, 2018, Toyota announced that it "ha[s] been examining the data that Kobe Steel provided (one or more years' worth) and evaluating the potential impacts of the materials purchased from Kobe Steel, using the data that contained the largest deviations from the specifications of Toyota or its suppliers. In these investigations, as for the materials listed in the thick-bordered boxes in the table below (materials purchased from Kobe Steel in Japan except for the products made from copper material reference in Kobe Steel's October 8 announcement), we have confirmed that our vehicles' quality and performance

satisfy our own internal standards." Toyota then provided the following table.

87.     Toyota noted that, as for some "materials (listed in the chart above), because they were purchased via numerous suppliers and used for various vehicle components, we will need additional time to complete our investigations. The safety and peace of mind of our customers are among our highest priorities, and we will continue to verify the safety of these products based on our most stringent standards."

| Method of delivery to Toyota | Date of announcement by Kobe Steel | Material | Impact on vehicles related to | |
|---|---|---|---|---|
| | | | Material purchased from Kobe Steel in Japan | Material purchased from Kobe Steel outside of Japan |
| Directly purchased | October 8 | Aluminum plates | No impact* | |
| | October 13 | Copper tubes, steel wires, etc. | Not applicable (no such material purchased) | |
| Purchased via supplier | October 8 | Aluminum plates | No impact* | |
| | | Cladding | No impact | Impact currently being confirmed |
| | | Aluminum extrusions | | |
| | | Copper products | Impact currently being confirmed | |
| | October 11 | Steel powder | No impact | Impact currently being confirmed |
| | | Sputtering target materials | | |
| | October 13 | Copper tubes, steel wires, etc. | | |

*Already announced on October 19, 2017

88.     On January 17, 2018, Toyota announced "the results of our investigations relating to the remaining materials," stating, "We have examined the data that Kobe Steel provided (one or more years' worth) and evaluated the potential impacts of the materials purchased from Kobe Steel, using the data that contained the largest deviations from the specifications of Toyota or its suppliers. In these investigations, regarding all of the materials referenced in Kobe Steel's announcements on October 8, 11, and 13, 2017 we have confirmed that our vehicles' quality and performance satisfy our own internal standards." Toyota then provided the following table.

| Method of delivery to Toyota | Date of announcement by Kobe Steel | Material | Impact on vehicles related to | |
|---|---|---|---|---|
| | | | Material purchased from Kobe Steel in Japan | Material purchased from Kobe Steel outside of Japan |
| Directly purchased | October 8 | Aluminum plates | No impact | |
| | October 13 | Copper tubes, steel wires, etc. | Not applicable (no such material purchased) | |
| Purchased via supplier | October 8 | Aluminum plates | No impact | |
| | | Cladding | No impact | No impact |
| | | Aluminum extrusions | | |
| | | Copper products | No impact | |
| | October 11 | Steel powder | No impact | No impact |
| | | Sputtering target materials | | |
| | October 13 | Copper tubes, steel wires, etc. | | |

*Thick-bordered boxes are newly announced today. Others were already announced on October 19 and November 6, 2017

19

# V. CERTAIN TOYOTA PRIUSES, CAMRIES, LAND CRUISERS, AND LEXUSES MANUFACTURED IN JAPAN CONTAIN KOBE'S SUBSTANDARD METAL

89. Vehicle models containing Substandard Metals manufactured by Toyota in Japan and sold or leased to consumers in the United States include examples at least the following vehicles:

    a.    Toyota Prius, Plug-in Hybrid (Prius Prime), Prius C, Prius V (2003+ model years)

    b.    Toyota Camry (2018 model year)

    c.    Toyota Land Cruiser J200 (2007+ model years)

    d.    2nd Generation Lexus GX (2010+ model years)

    e.    3rd Generation Lexus LX (2007+ model years)

    f.    4th Generation Lexus GS (2011+ model years)

90. For example, Toyota Priuses manufactured in Japan contain Substandard Metals from Kobe, including in body skeleton and panel parts like those depicted below. By early 2017, the Kobe "hot stamp" steel accounted for approximately 19% of the Prius, and Toyota's use of the material was increasing.





91.     Despite containing Substandard Metals, the official Toyota Prius website prominently displays "Body Rigidity" under a list of performance features, indicating that "Smart design, advanced materials, and innovative construction techniques help give Prius a strong, rigid chassis. Not only does this help contribute to greater safety and make the ride more comfortable, but this rigidity also helps enhance handing and braking performance . . . ." https://www.toyota.com/prius/prius-features.

92.     In addition, the fuel economy of the Prius, and perhaps other Toyota and Lexus vehicles, is affected by the weight of the vehicle, which is in turn affected by the thickness of aluminum sheets used in the vehicle. Accordingly, although the exact nature of Kobe's falsification is not yet known, it is possible that the falsification of metal data resulted in misstated fuel economy ratings.

93.     The 2018 Toyota Camry is the first Camry model to adopt an aluminum hood resulting from the 2014 joint venture between Kobe and Toyota, and was released in the U.S. market in July 2017. All 2018 model year Toyota Camrys sold in the U.S. were manufactured in Japan and contain Falsified Metal.

94.     These vehicles may also contain Substandard Metals in drivetrain (including engine) and suspension parts that may have been obtained from T1, T2, or T3 suppliers, as Kobe's metals were routinely used by the 525 affected customers to make such parts.

## VI.     THE FULL RAMIFICATIONS OF KOBE'S MASSIVE FRAUD ARE NOT YET KNOWN

95.     So long and widespread was Kobe's fraud that the full implications may not be known for some time. As Senator Richard Blumenthal (D-CT) wrote in a letter to Attorney General Jeff Sessions:

> [I]t may take some time for . . . defects to be realized or for the safety issues [caused by the Falsified Metals] to manifest. Regardless of whether or when such safety concerns become noticeable, this doesn't change the fact that U.S. companies paid or quality products not received. . . . [I]t is highly likely many consumers who purchased vehicles in the past ten years were harmed by Kobe Steel's deceit.

96.     On December 21, 2017, Kobe announced that the Independent Investigation Committee (IIC) would not complete its work by the end of the year, as it had initially announced. Kobe explained that, "In its work to verify self-inspections that had been conducted at 79 Kobe Steel Group locations . . . the IIC informed Kobe Steel that in light of ensuring the integrity of those inspections, some of the procedures of the inspections conducted at approximately 70% of the locations were not adequate and so a further investigation would be required."

97.     Kobe has admitted that "it is difficult for us, a materials manufacturer, to judge on how

nonconforming products may impact final products . . . ."

98.    Likewise, the tiered system of auto part suppliers obscures the origin of raw materials used in auto parts and purchased by manufacturers like Toyota. There is a significant likelihood that the Defective Vehicles contain Substandard Metals in parts for which Toyota has no way of knowing of their presence.

99.    Moreover, much information remains in defendants' exclusive possession, custody, and control, including, for example, the full identification of the exact parts of the Defective Vehicles containing Substandard Metal, and the extent to which such Substandard Metals failed to meet mandatory standards or other applicable specifications, *i.e.*, the exact manner in and degree to which the Substandard Metals are substandard.

100.    Other relevant information in defendants' exclusive possession, custody, and control includes the exact specifications for all affected parts, the reasons for the specifications including how they were arrived at, and the implications of parts being made with materials that do not satisfy the applicable specifications.

VII.    **TOYOTA WARRANTED THE DEFECTIVE VEHICLES**

A.    **Mr. Nava's 2015 Prius**

101.    Toyota's warranties as they relate to Mr. Nava's 2015 Prius are set forth in a 2015 Prius Warranty and Maintenance Guide.

102.    The 2015 Prius Warranty and Maintenance Guide states that Toyota "wish[es] you many miles of safe and pleasurable driving . . . ." It further states, "At Toyota, our top priority is always our customers. We know your Toyota is an important part of your life and something you depend on every day. That's why we're dedicated to building products of the highest quality and reliability." It further states, "Our goal is for every Toyota customer to enjoy outstanding quality, dependability and peace of mind throughout their ownership experience."

103.    The 2015 Prius Warranty and Maintenance Guide advises California residents that, in the event of a dispute, "Toyota offers you assistance through an informal dispute settlement program called the California Dispute Settlement Program (CDSP). . . . Failure to use the CDSP may affect your rights and remedies under California's 'Lemon Laws.'" Elsewhere, the 2015 Prius Warranty and Maintenance Guide states, "**Important:** You must use the Dispute Settlement Program (or, in California, the CDSP) before

seeking remedies through a court action pursuant to the Magnuson-Moss Warranty Act (the 'Act'). However, if you choose to pursue rights and remedies not created by the Act, you are not required to use the Dispute Settlement Program (CDSP). You may also be required to use the Dispute Settlement Program or CDSP before seeking remedies under the 'Lemon Laws' of your state."

104.   Toyota's warranties as they relate to Mr. Nava's 2015 Prius as set forth in a 2015 Prius Warranty and Maintenance Guide, include the following warranties: (a) "New Vehicle Limited Warranty," (b) "Federal Emission Control Warranty," (c) "California Emission Control Warranty," and (d) "Delaware, Pennsylvania, and Washington Vehicles Only" Warranty.

105.   The 2015 Prius Warranty and Maintenance Guide states that "The warrantor for these limited warranties is Toyota Motor Sales, U.S.A., Inc. ('Toyota'), 19001 South Western Avenue, Torrance, California 90509-2991, a California corporation."

106.   The 2015 Prius Warranty and Maintenance Guide states that it applies "to all 2015 model year Prius vehicles distributed by Toyota that are originally sold by an authorized dealer in the United States . . . . Warranty coverage is automatically transferred at no cost to subsequent vehicle owners."

107.   The 2015 Prius Warranty and Maintenance Guide states that "Repairs and adjustments covered by these warranties are made at no charge for parts and labor."

108.   The 2015 Prius Warranty and Maintenance Guide states that "The performance of necessary repairs and adjustments is the exclusive remedy under these warranties or any implied warranties. Toyota does not authorize any person to create for it any other obligation or liability in connection with this vehicle. **Any implied warranty of merchantability or fitness for a particular purpose is limited to the duration of these written warranties.** Some states do not allow restrictions on how long an implied warranty lasts, so this limitation may not apply to you."

### 1.   The New Vehicle Limited Warranty

109.   The 2015 Prius Warranty and Maintenance Guide sets forth the following warranty coverage under Toyota's New Vehicle Limited Warranty for the 2015 Prius.

| Warranty | Description | Length |
|---|---|---|
| Basic Warranty | This warranty covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, subject to the exceptions indicated under "What Is Not Covered" | 36 months / 36,000 miles (wheel alignment & balancing – 12 months / 12,000 miles) |
| Hybrid System Warranty | This warranty covers repairs needed to correct defects in materials or workmanship of the components listed here and supplied by Toyota, subject to the exceptions indicated under "What Is Not Covered"<br>• Battery control module (battery voltage sensor)<br>• Hybrid battery<br>• Hybrid control module (power management control module)<br>• Inverter with converter | 96 months / 100,000 miles |
| Powertrain Warranty | This warranty covers repairs needed to correct defects in materials or workmanship of any component listed below and in the next column and supplied by Toyota, subject to the exceptions indicated under "What Is Not Covered"<br>**Engine**<br>Cylinder block and head and all internal parts, timing gears and gaskets, timing chain/belt and cover, valve covers, oil pan, oil pump, engine mounts, engine control computer, water pump, fuel pump, seals and gaskets.<br>**Transaxle/Motor/Generator**<br>Case and all internal parts, transaxle mounts, seals and gaskets.<br>**Front-Wheel-Drive System**<br>Final drive housing and all internal parts, axle shafts, drive shafts, constant velocity joints, front hub and bearings, seals and gaskets. | 60 months / 60,000 miles |
| Restraint Systems | This warranty covers repairs needed to correct defects in materials or workmanship of any seatbelt or air bag system supplied by Toyota, subject to the exceptions indicated under "What Is Not Covered" | 60 months / 60,000 miles |
| Corrosion Perforation | This warranty covers repair or replacement of any original body panel that develops perforation from corrosion (rust-through), subject to the exceptions indicated under "What Is Not Covered" | 60 months |

### 2. The Federal Emission Control Warranty

110. The 2015 Prius Warranty and Maintenance Guide states that Toyota's Federal Emission Control Warranty is comprised of an Emission Defect Warranty and an Emission Performance Warranty.

111. The Emission Defect Warranty "warrants that your vehicle:" "Was designed, built and

24

equipped to conform at the time of sale with applicable federal emissions standards," and "Is free from defects in materials and workmanship that may cause the vehicle to fail to meet these standards." The 2015 Prius Warranty and Maintenance Guide advises that "Federal regulations require that this warranty be in effect for two years or 24,000 miles from the vehicle's in-service date, whichever comes first," but notes that "Specific components may have longer coverage under the terms" of other warranties.

112.    The Emission Performance Warranty states that "If an EPA-approved [inspection and maintenance] program is in force in your area, you are eligible for the Emission Performance Warranty coverage," which states, "Under the terms of the Emission Performance Warranty and federal regulations, Toyota will make all necessary repairs if both of the following occur: [(1)] Your vehicle fails to meet applicable emissions standards as determined by an EPA-approved emissions test[, and (2)] This failure results or will result in some penalty to you—such as a fine or denial of the right to use your vehicle—under local, state or federal law." The Emission Performance Warranty "is in effect for two years or 24,000 miles from the vehicle's in-service date, whichever occurs first."

113.    Not covered under the Federal Emission Control Warranty are "failures or noncompliance caused by: [(1)] The use of replacement parts not certified in accordance with aftermarket parts certification regulations[, and (2)] The use of replacement parts not equivalent in quality or design to original equipment parts."

114.    The specific components covered under the Federal Emission Control Warranty include:

**Air/Fuel Metering System**

• Air/fuel ratio feedback control system
• Electronic fuel injection system components
         - Airflow sensor
         - Engine control module (8/80)
         - Throttle body
         - Other components

**Air Induction System**

• Intake manifold and intake air surge tank

**Catalyst System**

• Catalytic converter and protector (8/80)
• Constricted fuel filler neck
• Exhaust manifold
• Exhaust pipe (manifold to catalyst and/or catalyst to catalyst)

**Evaporative Control System**

• Charcoal canister
• Diaphragm valve
• Fuel filler cap
• Fuel tank

**Hybrid System**

• Battery control module (battery voltage sensor) (8/80)
• Battery thermistor
• Generator
• Hybrid battery
• Hybrid control module (power management control module) (8/80)
• Inverter with converter
• Motor
• System main relay and battery current sensor

**Ignition System**

• Distributor and internal parts
• Ignition coil and ignitor
• Ignition wires
• Spark plugs

**Positive Crankcase Ventilation (PCV) System**

• Oil filler cap
• PCV valve or orifice

**Other Parts Used in Above Systems**

• Data link connector (8/80)
• Hoses, clamps, fittings, tubing and mounting hardware
• Malfunction indicator light and bulb (8/80)
• Pulleys, belts and idlers
• Sealing gaskets and devices
• Sensors, solenoids, switches and valves

**3.      The California Emission Control Warranty**

115.    The 2015 Prius Warranty and Maintenance Guide states that Toyota's California Emission Control Warranty applies to "Vehicles equipped with a California Certified Emission Control System that [is] sold, registered and operated in California or any state that adopts California emission warranty provisions . . . ." The 2015 Prius Warranty and Maintenance Guide further states that "Where a warrantable condition exists, Toyota will repair your vehicle at no cost to you, including diagnosis, parts and labor."

116.    Under the California Emission Control Warranty, "For 15 years or 150,000 miles," Toyota warrants that, *inter alia*, "if any emissions-related part is defective, the part will be repaired or replaced by

Toyota," which is referred to as "your Emission Control System DEFECT WARRANTY."

117.    Not covered under the California Emission Control Warranty are "The use of replacement parts not certified in accordance with aftermarket parts certification regulations," and "The use of replacement parts not equivalent in quality or design to original equipment parts."

118.    The 2015 Prius Warranty and Maintenance Guide summarizes Toyota's New Vehicle Limited Warranty, Federal Emission Control Warranty, and California Emission Control Warranty periods as follows.





\* Specific components may have longer coverage under terms of the Powertrain Warranty.



[1] Applies to California, Connecticut, Maine, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island and Vermont vehicles equipped with a California Certified Emission Control System. Vehicles covered by this warranty are also covered by the Federal Emission Control Warranty.

**B.    Mr. Malhotra's 2016 Prius *c***

119.    Toyota's warranties as they relate to Mr. Malhotra's 2016 Prius *c* are set forth in a 2016 Prius *c* Warranty and Maintenance Guide, and include the following warranties: (a) "New Vehicle Limited Warranty," (b) "Federal Emission Control Warranty," and (c) "California Emission Control Warranty." The terms of these warranties are in material respects the same as set forth above with respect to Mr. Nava's 2015

Prius.

120.    Mr. Malhotra purchased his 2016 Prius *c* used, but pursuant to its terms, Toyota's express warranty transferred to Mr. Malhotra, and is still in effect today.

**C.    Other Defective Vehicles**

121.    Toyota provided similar warranties for other Defective Vehicles.

## PLAINTIFFS' INJURY

**I.    ALEJANDRO NAVA**

122.    In 2014, plaintiff Alejandro Nava leased a new 2015 Prius, which was manufactured in Toyota's Tsutsumi Plant, in Toyota City, Aichi, Japan, from One Toyota of Oakland, an authorized Toyota dealer located at 8181 Oakport Street, in Oakland, California.

123.    If defendants had disclosed to Mr. Nava that Toyota Priuses manufactured in Japan, like the one he purchased, contained Substandard Metal, Mr. Nava would not have been willing to pay as much for his Prius, and may not have been willing to lease a Prius at all. Moreover, as a result of learning about the Substandard Metal in his Prius, Mr. Nava no longer has any desire to purchase his vehicle after the lease period expires, even if it would be to his economic advantage to do so.

124.    The negative publicity associated with Kobe's fraud and the use of Substandard Metals in the Defective Vehicles has diminished the market demand and market value of Mr. Nava's Prius, and accordingly, Mr. Nava has overpaid, and is continuing to overpay for the vehicle.

**II.    SHANTNU MALHOTRA**

125.    In early 2017, Plaintiff Shantnu Malhotra purchased a 2016 Prius *c* from dealer Hertz Car Sales, located at 4401 Stevens Creek Boulevard, in San Jose, California. Mr. Malhotra's Prius was manufactured in Toyota's Kanto Auto Works Plant, in Iwate, Japan.

126.    Prior to purchasing his Prius, Mr. Malhotra spent substantial time researching his purchase on Toyota's website, during which time he recalls being exposed to statements touting the Prius's safety, performance, and reliability.

127.    If defendants had disclosed to Mr. Malhotra that Toyota Priuses manufactured in Japan, like the one he purchased, contained Substandard Metal, Mr. Malhotra would not have been willing to pay as much for his Prius, and may not have been willing to purchase a Prius at all.

128.     Mr. Malhotra believes that he may be obligated to disclose to potential subsequent purchasers of his Prius that the vehicle contains Substandard Metal, and that any such disclosure would diminish the resale value of his Prius. Even if he is not obligated to disclose this fact, the negative publicity associated with Kobe's fraud and the use of Substandard Metals in the Defective Vehicles has diminished the market demand and market value of his Prius, and accordingly, Mr. Malhotra has overpaid, and is continuing to overpay for the vehicle.

## TOLLING OF THE STATUTE OF LIMITATIONS

129.     Defendants were and remain under a continuing duty to disclose to plaintiff and other class members the true character, quality, and nature of the Defective Vehicles, that these defects are the result of the Kobelco Defendants' systematic and long-term fraud, and that the defects will require costly repairs or will be unable to be repaired, and will diminish the resale value of the Defective Vehicles.

130.     The Kobelco Defendants have known of their falsification of data relating to the Substandard Metals used in the Defective Vehicles for as long as the fraud has taken place, well before plaintiffs and class members purchased or leased the Defective Vehicles. Until October 2017, the Kobelco Defendants failed to notify plaintiffs, class members, and the public, and actively concealed from them the full and complete nature of the defects.

131.     The Toyota Defendants have known of the defects since, at the latest, approximately August or September of 2017, but failed to notify plaintiffs, class members, and the public until October 2017. On October 18, 2017, November 6, 2017, and January 17, 2018, Toyota issued press releases in which it represented that it has "confirmed that our vehicles' quality and performance satisfy our own internal standards."

132.     Moreover, Toyota is a partial owner of Kobe Aluminum Automotive Products, LLC, and thus had constructive knowledge, and may have had actual knowledge of Kobe's fraud.

133.     Plaintiffs and other class members could not have reasonably discovered the true nature of the Defective Vehicles until shortly before this class action litigation was commenced. As the result of knowing and active concealment by defendants, any applicable statutes of limitation have been tolled.

## CLASS ACTION ALLEGATIONS

134.     Pursuant to Fed. R. Civ. P. 23, plaintiffs seek to represent a class comprised of all persons in

29

the United States who purchased or leased a Defective Vehicle, and a subclass of all persons in California who purchased or leased a Defective Vehicle.

135.    Plaintiffs nevertheless reserve the right to divide into subclasses, expand, narrow, more precisely define, or otherwise modify the class definition prior to (or as part of) filing a motion for class certification.

136.    The members in the proposed class and subclass are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all class members in a single action will provide substantial benefits to the parties and Court. Fed. R. Civ. P. 23(a)(1).

137.    There are questions of law and fact common to the class, Fed. R. Civ. P. 23(a)(2), which plaintiff may seek to litigate on an individual basis pursuant to Fed. R. Civ. P. 23(c)(4), including without limitation:

      a.    Whether and to what extent the Defective Vehicles contain Substandard Metals;

      b.    Whether the presence of Substandard Metals in the Defective Vehicles renders them unsafe;

      c.    Whether the presence of Substandard Metals in the Defective Vehicles renders them less useful or of lesser quality;

      d.    Whether the presence of Substandard Metals in the Defective Vehicles renders them less valuable;

      e.    Whether defendants breached any express or implied warranties with respect to the Defective Vehicles;

      f.    Whether class members overpaid for the Defective Vehicles;

      g.    The proper amount of statutory or compensatory damages;

      h.    The proper amount of restitution;

      i.    The proper amount of punitive damages;

      j.    The proper injunctive or prospective relief; and

      k.    The proper amount of reasonable litigation expenses and attorneys' fees.

138.    Plaintiffs' claims are typical of class members' claims in that they are based on the same underlying facts, events, and circumstances relating to defendants' conduct.

139.     Plaintiffs will fairly and adequately represent and protect the interests of the class, have no interests incompatible with the interests of the class, and have retained counsel competent and experienced in class action litigation.

140.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each class member is small such that, absent representative litigation, it would be infeasible for class members to redress the wrongs done to them.

141.     Questions of law and fact common to the class predominate over any questions affecting only individual class members.

142.     As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and may be appropriate for certification "with respect to particular issues" under Rule 23(c)(4).

<strong><u>CAUSES OF ACTION</u></strong>

<strong>FIRST CAUSE OF ACTION</strong>

<strong>VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. §§ 2301 ET SEQ.</strong>

<strong>(On behalf of the Nationwide Class)</strong>

143.     Plaintiffs reallege and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

144.     The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

145.     Plaintiffs and class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3), because they are entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

146.     Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

147.     The Magnuson-Moss Warranty Act permits a consumer to recover damages caused "by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this [Act], or under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1).

148.     Toyota's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

149.     Defendants provided plaintiffs and other class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As part of the implied warranty of merchantability, defendants warranted that the Defective Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

150.     Defendants breached these warranties, as described in more detail herein, and are therefore liable to plaintiffs and the class pursuant to 15 U.S.C. § 2310(d)(1).

151.     Without limitation, the Defective Vehicles share common design defects in that they are equipped with Substandard Metals in key areas, leaving occupants of the Defective Vehicles vulnerable to serious injury and death, and negatively affecting the performance of the vehicles.

152.     Plaintiff and other class members have had sufficient direct dealings with either defendants or their agents (including Toyota and its dealerships and technical support) to establish privity of contract between defendants, on the one hand, and plaintiffs and the class members, on the other hand.

153.     Nevertheless, privity is not required because plaintiffs and other members of the class are intended third-party beneficiaries of contracts between defendants and Toyota dealers, and specifically, of defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

154.     Affording Toyota a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of the sale or lease of each Defective Vehicle, Toyota knew, or should have known, or was reckless in not knowing of its omissions concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defects. Particularly given the prevalence of Substandard Metal throughout the Defective Vehicles, for example in body panels, frames and skeletons, drive trains, and other component parts, as well as the likelihood that the full extent of the problem is not yet even known, under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that plaintiff resort to an informal dispute resolution procedure or afford Toyota a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied. Nevertheless, prior to asserting these claims, plaintiffs gave

defendants written notice of their breaches of warranty.

155.     In their capacity as warrantors, as defendants had knowledge of the inherent defects in the Defective Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage of the Defective Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Defective Vehicles is null and void. Any such limitations on the warranties are procedurally unconscionable since there was unequal bargaining power between defendants, on the one hand, and plaintiff and other class members, on the other hand.

156.     Plaintiffs and other class members were injured as a direct and proximate result of defendants' breaches because they would not have purchased or leased the Defective Vehicles on the same terms if they had known the true facts concerning the amount the products make, and lost a substantial portion of the bargain they expected.

157.     The amount in controversy of plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000 exclusive of interest and costs, computed on the basis of all claims to be determined in the lawsuit.

158.     Plaintiffs, on behalf of themselves and the nationwide class, seek all damages permitted by law, including without limitation diminution in value of the Defective Vehicles in an amount to be proven at trial; equitable relief; and attorney's fees and costs pursuant to 15 U.S.C. § 2310(d)(1)-(2).

## SECOND CAUSE OF ACTION

## VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES, CAL. CIV. CODE §§ 1791.2 & 1793.2(D)

### (By the California Subclass)

159.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

160.     Plaintiffs and other class members who purchased or leased Defective Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

161.     The Defective Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

162.     Toyota is a "manufacturer" of the Defective Vehicles within the meaning of Cal. Civ. Code §

1791(j).

163.   Plaintiffs and other class members purchased or leased new or used motor vehicles manufactured by Toyota containing Substandard Metal.

164.   Toyota made express warranties to plaintiffs and other class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

165.   In its Limited Warranty applicable to the Defective Vehicles, Toyota expressly warranted that it would repair or replace defects in materials or workmanship free of charge during the warranty period.

166.   As set forth herein, the Defective Vehicles are inherently defective in that there are defects in their metals that render certain crucial safety and performance systems compromised or otherwise sub-optimal. These defects were and continue to be covered by Toyota's express warranties, and substantially impair the use, value, and safety of the Defective Vehicles to reasonable consumers like plaintiffs and other class members.

167.   As a result of Toyota's breach of its express warranties, plaintiffs and other class members received goods whose dangerous and otherwise sub-optimal condition substantially impairs their value to plaintiffs and other class members. Plaintiffs and other class members have been damaged as a result of the diminished value and usefulness of the Defective Vehicles.

168.   Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, plaintiffs and other class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Defective Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

169.   Pursuant to Cal. Civ. Code § 1794, plaintiffs and other class members are entitled to attorneys' fees and costs.

### THIRD CAUSE OF ACTION

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF

### IMPLIED WARRANTIES, CAL. CIV. CODE §§ 1791.1 & 1792

### (By the California Subclass)

170.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

171.   Plaintiffs and other class members who purchased or leased Defective Vehicles in California

1   are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

2   172.   The Defective Vehicles are "consumer goods" within the meaning of Cal. Civ. Code §

3   1791(a).

4   173.   Toyota is a "manufacturer" of the Defective Vehicles within the meaning of Cal. Civ. Code §

5   1791(j).

6   174.   Toyota impliedly warranted to plaintiffs and the other class members that the Defective

7   Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792. However, the

8   Defective Vehicles do not have the quality that a buyer would reasonably expect.

9   175.   Cal. Civ. Code § 1791.1(a) states that "Implied warranty of merchantability" or "implied

10  warranty that goods are merchantable" means that the consumer goods (a) pass without objection in the trade

11  under the contract description, (b) are fit for the ordinary purposes for which such goods are used, (c) are

12  adequately contained, packaged, and labeled, and (d) conform to the promises or affirmations of fact made

13  on the container or label.

14  176.   The Defective Vehicles would not pass without objection in the automotive trade because of

15  their inclusion of Substandard Metals in certain crucial structural, safety, and performance systems.

16  177.   The Defective Vehicles are not fit for the ordinary purpose for which such goods are used

17  because, do to their inclusion of Substandard Metals in certain crucial structural, safety, and performance

18  systems, they are not safe and reliable to drive and thus not fit for ordinary purposes.

19  178.   The Defective Vehicles are not adequately labeled because their labeling fails to disclose the

20  defects or the presence of the Substandard Metals, affecting certain crucial structural, safety, and

21  performance systems.

22  179.   Toyota breached the implied warranty of merchantability by manufacturing and selling

23  Defective Vehicles containing defects associated with the Kobe Defendants' Substandard Metals.

24  Furthermore, these defects have caused plaintiffs and other class members to not receive the benefit of their

25  bargain and have caused the Defective Vehicles to depreciate in value.

26  180.   As a direct and proximate result of Toyota's breach of the implied warranty of

27  merchantability, plaintiffs and the other class members received goods whose dangerous and dysfunctional

28  conduction substantially impairs their value to plaintiffs and other class members. Plaintiffs and other class

1   members have been damaged as a result of the diminished value of the Defective Vehicles.

2   181.   Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, plaintiffs and other class members are

3   entitled to damages and other legal and equitable relief including, at their election, the purchase price of their

4   Defective Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

5   182.   Pursuant to Cal. Civ. Code § 1794, plaintiffs and other class members are entitled to attorneys'

6   fees and costs.

7   **FOURTH CAUSE OF ACTION**

8   **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, CAL. COMM. CODE § 2314**

9   **(By the California Subclass)**

10   183.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set

11   forth herein.

12   184.   Toyota is a merchant with respect to motor vehicles under Cal. Comm. Code § 2104.

13   185.   A warranty that the Defective Vehicles were in merchantable condition was implied by law

14   in the instant transaction, pursuant to Cal. Comm. Code § 2314.

15   186.   The Defective Vehicles, when sold and at all times thereafter, were not in merchantable

16   condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles

17   are inherently defective in that Substandard Metals are used throughout the Defective Vehicles, including in

18   body panels, body frames and skeletons, and drivetrains, and thus affect crucial structural, safety, and

19   performance systems.

20   187.   Plaintiffs and other class members have had sufficient direct dealings with either Toyota or

21   its agents (Toyota dealerships) to establish privity of contract between plaintiffs and the class members, on

22   the one hand, and Toyota on the other hand. Notwithstanding, privity is not required in this case because

23   plaintiffs and the other class members are intended third-party beneficiaries of contracts between Toyota and

24   its dealers, and specifically the intended third-party beneficiaries of Toyota's implied warranties, since the

25   dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under

26   the warranty agreements provided with the Defective Vehicles. Rather, the implied warranties were designed

27   for, and intended to benefit the ultimate customers only. Privity is also not required because plaintiffs' and

28   other class members' vehicles are dangerous instrumentalities due to their defects discussed herein.

188.    As a direct and proximate result of Toyota's breach of warranties of merchantability, plaintiffs and other class members have been damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW,**

**CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.***

**(By the California Subclass)**

189.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

190.    The FAL prohibits any statement in connection with the sale of goods "which is untrue or misleading," Cal. Bus. & Prof. Code § 17500.

191.    Toyota's statements regarding the rigidity of its Priuses, regarding the safety of the Defective Vehicles, and regarding the fuel economy of the Defective Vehicles, is deceptive in light of the Substandard Metals present in the Defective Vehicles.

192.    Toyota knew, or reasonably should have known, that these statements were untrue or misleading.

**SIXTH CAUSE OF ACTION**

**VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CAL. CIV.**

**CODE §§ 1750 *ET SEQ.***

**(By the California Subclass)**

193.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

194.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

195.    Defendants' policies, acts, and practices were designed to, and did, result in the purchase and use of Defective Vehicles primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

    a.    § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

196.    Plaintiffs, on behalf of themselves and the class, seek injunctive relief, restitution, and reasonable attorneys' fees and costs.

197.    In compliance with Cal. Civ. Code § 1782, plaintiffs sent written notice to defendants of their claims. Although plaintiffs do not currently seek damages for their claims under the CLRA, if defendants refuse to remedy the violation within 30 days of receiving the notice letter, plaintiffs may thereafter amend this Complaint to seek damages.

198.    In compliance with Cal. Civ. Code § 1782(d), an affidavit of venue is filed herewith.

## SEVENTH CAUSE OF ACTION

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW,

## CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*

## (By the California Subclass)

199.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

200.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200.

## Fraudulent

201.    The acts alleged herein were fraudulent in that defendants knowingly and intentionally concealed from plaintiffs and other class members that the Defective Vehicles suffer from defects, while obtaining money from plaintiffs.

202.    The acts alleged herein were fraudulent in that defendants marketed and sold the Defective Vehicles as possessing functional properties they did not have, and as being free from defects, which was untrue.

**Unfair**

203.     Defendants' conduct with respect to the manufacture and marketing of the Defective Vehicles was unfair because defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to its victims.

204.     Defendants' conduct with respect to the manufacture and marketing of the Defective Vehicles was also unfair because it violated public policy as declared by specific constitutional, statutory, or regulatory provisions, including the Magnuson-Moss Warranty Act.

205.     Defendants' conduct with respect to the manufacture and marketing of the Defective Vehicles was also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided.

**Unlawful**

206.     The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

    a.     The Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.*;

    b.     The California Commercial Code, Cal. Comm. Code §§ 2314;

    c.     The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*; and

    d.     The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*

**EIGHTH CAUSE OF ACTION**

**FRAUD BY CONCEALMENT**

**(By the California Class)**

207.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

208.     As set forth herein, defendants concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Defective Vehicles.

209.     Toyota had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Defective Vehicles as safe, functional, and reliable. Once Toyota made representations to the public about safety, functionality, and reliability, Toyota was under a duty to disclose these omitted facts.

210. Defendants also had a duty to disclose these omitted facts because they were known or accessible only to defendants, who had superior knowledge and access to the facts, and defendants knew they were not known or reasonably discoverable by plaintiffs and other class members. These omitted facts were material because they directly impact the safety, quality, functionality, and reliability of the Defective Vehicles.

211. Defendants possessed exclusive knowledge of the defects rendering the Defective Vehicles inherently more dangerous, less functional, and less reliable than similar vehicles.

212. Defendants actively concealed or suppressed these material facts, in whole or in part, with the intent to induce plaintiffs and other class members to purchase or lease Defective Vehicles at a higher price for the Defective Vehicles, which did not match their true value.

213. Defendants still have not made full and adequate disclosure and continue to defraud plaintiffs and other class members, withholding from the public most of the information in their possession, custody, and control concerning the Substandard Metals and their incorporation into the Defective Vehicles.

214. Plaintiffs and other class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts. Plaintiffs' and other class members' actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public, plaintiffs, or the class.

215. As a result of the concealment or suppression of material facts, plaintiffs and other class members have sustained damage.

216. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of plaintiffs' and other class members' rights and well-being, to enrich defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## **PRAYER FOR RELIEF**

217. Wherefore, plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against defendants as to each and every cause of action, and the following remedies:

a. An Order certifying this action as a class action, appointing plaintiffs as Class Representatives, appointing their counsel as Class Counsel, and requiring defendants to bear the cost

of class notice;

b.      An Order providing for necessary and appropriate prospective injunctive relief including, without limitation, enjoining defendants from continuing to engage in any practice the Court finds to be deceptive, fraudulent, or misleading; requiring defendants to commence a program to recall and repair, replace, or repurchase Defective Vehicles, or offer class members another appropriate refund; and requiring defendants to engage in a corrective advertising campaign;

c.      An Order requiring defendants to pay all statutory, compensatory, and punitive damages permitted under the causes of action alleged herein;

d.      An Order requiring defendants to pay restitution to restore funds that may have been acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of the UCL, FAL, or CLRA;

e.      An Order requiring defendants to disgorge or return all monies, revenues, profits, or other unjust enrichment obtained by means of any wrongful or unlawful act or practice;

f.      Pre- and post-judgment interest;

g.      Costs, expenses, and reasonable attorneys' fees; and

h.      Any other and further relief as may later be requested, or which the Court deems necessary, just, or proper.

## **JURY DEMAND**

218.    Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 5, 2018          /s/ Jack Fitzgerald

**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 4th Ave., Ste. 202
San Diego, CA 92103
Phone: (619) 692-3840
***Counsel for Plaintiff and the Putative Class***

41